UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 16-CR-463 |
| v. | ) | Honorable Virginia M. Kendall |
| | ) | Judge Presiding |
| ISRAEL MATA | ) | |

**DEFENDANT MATA'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION
REPORT AND POSITION PAPER AS TO SENTENCING FACTORS**

The Defendant, ISRAEL MATA, by and through his attorney, JOSEPH R. LOPEZ, and

pursuant to Federal Rule of Criminal Procedure 32 and Local Criminal Rule 32.1, submits his

Objections to the Pre-Sentence Investigation Report ("PSIR") and Position Paper as to

Sentencing Factors, stating as follows:

**I.       Background**

Mr. Mata joined the Pullman Latin Kings Chapter in 1999 and remained a member of that

chapter until 2011. This Chapter was formed in the Southwest Region of the Latin Kings

Organization. However, in or around 2003 or 2004 Pullman was relocated to the Southeast

Region of the Latin Kings which is the enterprise charged in this indictment. In 2011, Mr. Mata

transferred to the 97th Street Chapter, and then in 2012, he joined the Roseland Chapter all within

the Southeast Region. Mr. Mata was indicted in this case for his membership in the Southeast

Region of the Latin Kings not for his prior membership in the Southwest Region. AUSA Cooke

told the jury in the codefendants jury trial, this indictment focused on the Southeast Region of

the Latin Kings.

During the co-defendant's trial Government witness Vargas, the Regional Inca, described

how the restructuring of the gang occurred in 2003. Vargas testified his region was restructured

and he was given new chapters which included Mr. Mata's chapter which had been in the Southwest region and was moved into the Southeast region in 2003. Mr. Mata agreed to the restructuring by became a new member of the charged enterprise.

At no time did Mr. Mata hold any rank in the Latin Kings. He was a soldier and lost interest in the gang as he matured. He did participate in some gang activities, but he never sold narcotics or engaged in any other planned criminal behavior for profit. Mr. Mata did know that other members trafficked in narcotics and that they participated in murders. Mr. Mata, however, never agreed to the commission of any murders, and he never participated in any murders. Mr. Mata was a low-ranking member of this chapter of the Latin Kings in the Southeast Region.

Sometime prior to the FBI beginning its investigation in mid-2013, the Kings put out a shoot-on-sight ("SOS") order against Mr. Mata. This SOS order was a result of Mr. Mata ignoring the dictates of the Latin Kings, and his refusal to pay dues or attend gang meetings. Mr. Mata was distancing himself from the Latin King life in 2013. After the FBI began its investigation, it intercepted a July 12, 2014 phone call between Eduardo Delgado and Carlos Padilla, Jr., the Regional Enforcer of the Latin Kings. During the phone call, the two men discussed Mr. Mata's status on SOS, and the fact that no one could hang out with Mr. Mata. Once the Kings issued the SOS in 2013, an order which continues to this day. Mr. Mata has retired from the gang life. The FBI knew of the SOS from an interview with a confidential source ("CS") on May 23, 2016.This interview was conducted by FBI Agent Peetz, the CS told him that Mr. Mata was still on SOS from Roseland.

The Latin Kings tried to kill Mr. Mata in 2013. From the day that they put him on SOS, Mr. Mata ended his agreement with the objects of the Latin Kings conspiracy. In a grand jury statement by government witness Fernando Chavez, Latin Kings found Mr. Mata at the

Horseshoe Casino in Hammond, Indiana. Chavez stated that he saw "Pimp" from the Roseland Chapter holding a gun with an extended clip, firing shots at Mr. Mata, who suffered a bullet wound, and his vehicle was damaged by multiple gunshots. From the beginning of 2013 until this indictment, Mr. Mata remained on SOS in the Latin Kings from the Southeast Region.

## II.      Objections to the Presentence Investigation Report

### A.      Page Eight, Paragraph 12

Mr. Mata has numerous objections to the PSIR. On page eight, paragraph 12, it should state that Pullman and Roseland were part of the Southwest Region in the late 1990's until early 2003-2004. After 2003, Pullman and Roseland were imported into the Southeast Region, which is the charged enterprise in this case and is a distinct enterprise from the Southwest Region. Pullman was not in any agreement with the Latin Kings in the Southwest Region until 2003-2004 when Pullman and Roseland joined the Southeast Region. Moreover, any act prior to 2003-2004 cannot be considered relevant conduct as they occurred prior to the charged conduct in this case.

In *United States v. King,* 910 F.2d. 320 (7th Circuit 2018), the court stressed that relevant conduct pursuant to U.S.S.G §1B1.3(1)(B) must occur during the commission of the instant offense. Here, the alleged acts of relevant conduct which occurred prior to Mr. Mata's membership in this conspiracy cannot be relevant conduct because they did not occur during his membership in this conspiracy. Mr. Mata was in separate conspiracy at the time of the acts in the Southwest Region. In conclusion, any acts alleged which occurred prior to 2003-2004 cannot be considered as relevant conduct as they did not occur during the commission of this offense.

### B.      Page Eight, Paragraph 14

In addition to that objection, on page eight, paragraph 14, the PSIR describes many events which were not part of this conspiracy. For instance, Ivan Quiroz testified before the grand jury about events that are in dispute, and not part of this conspiracy. He testified about a shooting in 1999, while he and Mr. Mata were not even part of the instant conspiracy. During his trial testimony, Quiroz admitted to lying about a murder during his proffer to the government. (Tr. 2004, 2020, 2069). Hence, Quiroz's credibility is an issue by itself, but it also contradicts what the government is claiming in the PSIR. In the government's version of events, Quiroz provided unsupported assertions that in 1999, Mr. Mata was shooting at members of the Latin Counts gang. Quiroz also claimed, without corroboration, that Mr. Mata committed other acts, including a knife attack, but not that he was involved in shooting a Gangster Disciple gang member. By contrast to Quiroz's testimony, the PSIR asserts that Mr. Mata was involved in the shooting of a Gangster Disciple. This evidence has not been proved by the preponderance of evidence and should be excluded from consideration and calculation. *United States v Holton,* 873 F.3d 589 (7th Cir. 2017) (uncharged conduct can be used to enhance a sentence only if proved by preponderance of the evidence). Moreover, this conduct if true is not relevant as these acts did not occur during the commission of this offense as they predate Mr. Mata membership in this conspiracy. In *United States v. King* 910 F.3d 320 (7th Cir. 2018) the court considered relevant conduct and noted that to be relevant the conduct must occur during the commission of the instant offense.

Moreover, these alleged acts, would not be part of the instant conspiracy because Mr. Mata was not yet joined this conspiracy until 2003-2004. Again, these acts cannot be considered relevant conduct because the events preceded his membership and should be excluded from any sentencing calculation. Federal courts cannot calculate a conspirator's sentence based on

conduct that occurred before he joined the conspiracy. *United States v. Burnett*, 827 F.3d 1108, 1121 (D.C. Cir. 2016). Similarly, the First Circuit explained that although "past performance of the conspiracy, known to the late-joining co-conspirator, may be relevant at sentencing," the defendant's "sentencing cannot be based on mere knowledge of historic facts." *United States v. O'Campo*, 973 F.2d 1015, 1025-26 (1st Cir. 1992). Here, this Court should not attribute any relevant criminal conduct to Mr. Mata prior to his membership in this conspiracy not only based on the above cases but also under U.S.S.G. 1B1.3(a)(1)(B) as the conduct did not occur during the commission of this offense because he was a member of a separate and distinct conspiracy. The only common fact is the defendants in both conspiracies identify themselves as Latin Kings. Unlike the 1999 shooting, which had nothing to do with Mr. Mata, he does admit to involvement in the shooting on March 13, 2005. This shooting was while he was a member of the Southeast Region in this charged conspiracy and is relevant conduct. Mr. Mata already served nearly four years' imprisonment for that conduct, the Court should credit Mr. Mata with the time that he already served for the 2005 shooting.

C.      Page Nine, Paragraph Nine

With regard to page nine, paragraph nine of the PSIR, Mr. Mata objects to any information regarding the beating of Jose Cano in February 2000, as a warning for cooperation. FBI agents interviewed Mr. Cano on September 12, 2017, at which time he did not identify Mr. Mata as one of his attackers. According to Mr. Cano, multiple people participated in the attack, and he was unaware that the beating was a violation by the Latin Kings for providing information to the police.

D.      Page Nine, Paragraph 16

Also on page nine, paragraph 16, the PSIR should state that the Latin Kings put Mr. Mata on SOS in mid-2013. Mr. Mata was distancing himself from the Latin Kings, and he refused to attend meetings or participate in gang activities. Moreover, when Mr. Mata was arrested in this case, he was still on SOS status.

E.      Page Nine, Paragraph 18

Mr. Mata also objects to the allegation on page nine, paragraph 18. He was never involved in drug trafficking and his criminal history supports that position. Any references to drug trafficking should be removed from the PSIR, as it is not applicable to Mr. Mata.

F.      Page 10, Paragraph 19

Likewise, he objects to page 10, paragraph 19. Mr. Chavez testified at trial that he was bar hopping with other Latin Kings. He spoke with Mr. Mata who informed Chavez he was going to the Tally Ho Bar. Mr. Chavez then headed toward the Tally Ho bar to meet Mr. Mata.

On his way to the Tally Ho Bar, Chavez testified that Mata called him and told him not to go because there were a lot of Latin Dragons who are rivals of the Latin Kings. Despite this warning, Chavez and others decided to go anyway and fight with the Dragons. This court should take into consideration that Mr. Mata warned Chavez not to come to the bar to avoid confrontation, but it was Chavez who made the decision to ignore Mr. Mata and proceed to the Tally Ho to confront the Latin Dragons as he testified.

Mr. Mata also admits that he was involved in a shootout at the Horseshoe Casino in which he was shot, and his car was riddled with bullets. However, the shooting had nothing to do with him trying to maintain or further the gang's goals, and nothing to do with him trying to further his position in the Latin Kings. Rather, Mr. Mata was a victim of attempted murder by gang members from whom he had been trying to distance himself.

Photos of the incident show Mr. Mata's vehicle was riddled with bullet holes. Shots pierced the driver's door and passenger's door, and Mr. Mata's blood was splattered on the driver's seat. There was a bullet hole in the trunk, and the passenger and driver's door windows were shattered. The Latin Kings meant business, as it appears that they used large caliber ammunition in their attempt to kill Mr. Mata.

G.      Page 10, Paragraph 25

Mr. Mata objects to the government's characterization regarding "several delays" on page 10, paragraph 25. At the time in questions, Mr. Mata was unable to effectively communicate with his counsel. After proper consultation, which was his constitutional right, Mr. Mata cooperated fully, and completed the presentence interview.

H.      Page 11, Paragraph 29

On page 11, Paragraph 29, Mr. Mata objects to the application of U.S.S.G § 2A1.5(a). He takes the position that his conduct should fall under U.S.S.G § 2A2.1, which is a level 27, and not a level 33. The bar fight at the Tally Ho Bar in Count Four of the indictment supports this position, as no one was murdered. Mr. Mata's overt acts on that occasion did not lead to anyone's death. Furthermore, the more serious underlying racketeering activity of others should not be attributable to Mr. Mata. In *United State v. Porraz*, 943 F.3d 1099 (7th Cir. 2019), a codefendant from this case appealed his sentence and argued that the conspiracy to commit murder did not apply because he did not kill anyone. Instead, he argued, as does Mr. Mata, that the correct guideline that the court should apply is the attempt murder guideline § 2A2.1, given that the murder was not within the scope of his agreement.

However, unlike Mr. Mata, Porraz admitted in his plea declaration that the Latin Kings expected him to participate in, and support the gang by fighting, stabbing, shooting, and killing

rival gang members. Based in part on Porraz's admission, the Court held that § 2A1.5 applied, and not § 2A2.1. Because Mr. Mata did not make this admission, this Court should contemplate the application of the attempt murder guideline and not the conspiracy to commit murder guideline, which is an upward adjustment of 6 levels. Mr. Mata did not join this conspiracy until 2003-2004, and since then, the only activity he was involved in was the Tally Ho Bar incident in Count Four and the uncharged conduct of the 2005 shooting for which he served a sentence of 4 years.

> I.      Page 11, Paragraph 30

Similarly, page 11, paragraph 30 should state that Mr. Mata joined the Latin Kings in 1999, at which time he was from the Pullman Chapter in the Southwest Region. He was not part of this conspiracy until 2003-2004 when Pullman joined the Southeast Region.

> J.      Page 12, Paragraph 41; and Page 13, Paragraph 45

Mr. Mata also objects to the improper characterizations of the Tally Ho Bar fight on page 12, paragraph 4 and page 13. Paragraph 45.   According to Chavez's trial testimony he and others were bar hopping this evening. Chavez testified he received a phone call from Mata who told him that he was going to the Tally Ho Bar.  A short time later, Chavez testified he received a call from Mr. Mata who told Chavez not to come to the bar because the rival Latin Dragons were there. Chavez testified he decided to go anyway. At no time did Mr. Mata request assistance to attack the Latin Dragons, had Chavez heeded the advice of Mr. Mata, this fight would not have occurred.

> K.      Page 15, Paragraph 63; Page 20, Paragraph 24; and Page 22, Paragraph 87

Page 15, paragraph 63 should state that Mr. Mata was admitted to IDOC on July 24, 2001, not 2011. In addition, paragraph 87 on page 22 should be corrected to document that Mr.

Mata's father died in 2013, not 2012. Also, page 20, paragraph 24 should be corrected, as Mr. Mata has pain in his left shoulder, not his right shoulder.

Mr. Mata's advisory adjusted offense level should be a 27 with a three-point deduction for acceptance of responsibility, as set forth in § 3E1.1(a)(b). The reduced offense level of 24, with a criminal history score of 14 points, establishes a criminal history category of VI; however, because the 2005 shooting was part of the same course of conduct as the instant conspiracy, Mr. Mata's criminal history core should be 11, yielding a category of V. The advisory sentence range would thus be 92-115 months' imprisonment.

### III. Response to Conditions of Supervised Release

Mr. Mata has no objections to the conditions of supervised release.

### IV. Position Paper as to Sentencing Factors

#### A. Mr. Mata's Sentencing Request

Pursuant to 18 U.S.C. § 3553(a), Mr. Mata respectfully requests that this Honorable Court impose a sentence of 78 months' imprisonment. He ceased his participation and membership in the Latin Kings, as evinced by the fact that in 2013, he was victim of an attempted murder by the gang. There is no doubt that he is still on SOS status and not an active member of this conspiracy.

The Guidelines are now in their 17th year of being advisory. *United States v. Booker*, 543 U.S. 220 (2005). Indeed, this guideline range is simply one factor amongst many that courts must consider when determining the appropriate sentence for the individual defendant who stands before it. *United States v. Kimbrough*, 552 U.S. 85, 90 (2007). Further, when a district court varies from the Guidelines, its decision "may attract greatest respect when" it is based on the

particular facts of a case." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013) (citing *Kimbrough* at 109).

Here, the particular facts of this case, and characteristics of Mr. Mata, show that a guideline sentence is not necessary. Mr. Mata was almost murdered by the Latin Kings, a factor that is not in dispute, and not contemplated by the Sentencing Commission. This is an important consideration because it stands out among the many reasons as to why Mr. Mata is unlikely to ever participate in the Latin Kings again, or in any other street gang. The shooting was unlike any other deterrent conduct one can experience.

**B.**    **A Sentence of 78 months with 3 years' Supervised Release Fully Meet the Factors Set Forth in 18 U.S.C. § 3553(a)**

1.    *The Nature and Circumstances of the Offense and History and Characteristics of Mr. Mata.*

The nature and circumstances of the offense were explained above. Mr. Mata never earned a leadership position in the Latin Kings. He drifted away from the gang, resulting in an SOS order being issued in 2013. Furthermore, Mr. Mata did not sell narcotics or weapons. His last conviction for a weapon was in 2015, and served jail time as a result of that offense. His possession of the weapon was a necessary result of him being a victim of an attempted homicide by the Latin Kings, and his continued status on SOS.

According to the PSIR, Mr. Mata has a strong employment history. His longest period of continuous employment was at Menard's, where he worked for more than three years. This should indicate to the Court that he can re-enter society and find gainful employment. Mr. Mata left Menard's because of his firearm offense conviction. Mr. Mata has been in continuous custody since June 4, 2015, for a total of 79 months and 16 days, as of the date of this filing. He

was in Indiana State custody from June 4, 2015, until August 8, 2016, when he was remanded on this case.

Mr. Mata has a strong family background, despite the fact that his mom and dad separated and divorced. Mr. Mata's father tried to influence his son with negative factors regarding his mother. As he grew older, however, the negative statements ceased, and his mother became his best friend. Mr. Mata maintains contact with his brothers, and his family supports him and will welcome him back home upon his release. His father died from a stroke, the same day that the Latin Kings attacked Mr. Mata -- he had visited his father in the hospital earlier that day. The passing of his father was very difficult for him.

Mr. Mata has one child. His child's mother had two children prior to the birth of his child, but Mr. Mata treats all three of the children as his own, which is a very positive character trait. Mr. Mata began to change after the birth of his child; this is reflected in the letter that Cecial and Miguel Miranda submitted, in which they wrote about how they saw Mr. Mata distancing himself from the Latin Kings, whom they describe as "the wrong" crowd. They also noted how at the time, Mr. Mata owned an apartment building, as noted in the PSIR at page 27, paragraph 121. The change that the Miranda's noted was also apparently understood by the Latin Kings, which resulted in them issuing an SOS for Mr. Mata because he refused to continue participating in gang activities.

Mr. Mata's daughter's mother wrote why she was attracted to Mr. Mata, in part because of his work ethic and his ambition. They had a child together and 10 months later, Mr. Mata went to prison on his gun case. She noted how he was changing with the birth of his daughter, which supports the conclusion that he was distancing himself from Latin King life. Likewise, he and his mother purchased an apartment building to raise his daughter and stepchildren. Mr. Mata

11

is described as a loving loyal parent, trying to change his life. This is why the Latin Kings tried to kill him, he chose family over the Latin Kings. Mary Arrendando, the grandmother of Mr. Mata's child, described the glee that he expressed when he found out he was going to be a father.

Mr. Mata's step daughter, Marisol Arrendando, described how it was when Mr. Mata entered her life, she did not have a father figure prior to Mr. Mata. But he stepped in and treated her as his own. Marisol stated that her and her sisters want Mr. Mata back home, which means he must have been a good stepdad. Brenda Arrendando also wrote a letter about how much she misses Mr. Mata, and wrote about her baby sister, Mr. Mata's child. Both children have glowing reviews of Mr. Mata, a very positive person in their life, who chose them over the Latin Kings, which almost cost him his life.

Ms. Mata wrote a letter describing her relationship with her ex-husband. The PSIR makes a reference to this on page 22, paragraphs 90 and 91. Ms. Payan described how the family had attended church for years. Further, Mr. Mata earned certificates from World Bible School. Mr. Mata studied the Bible before he was arrested -- that was not something that he picked up in prison -- as he and his family were members of the World Missionary Movement.

While in custody Mr. Mata had his share of physical health conditions, which are detailed in the PSIR on page 24, paragraph 100. His nerve pain was the proximate result of the Latin Kings trying to kill him at the Horseshoe Casino. In addition, Mr. Mata has glaucoma and other eye ailments. The COVID-19 scare in the MCC also wore on Mr. Mata's nerves, as it did with other inmates who had to deal with the stress of possibly dying from the virus while inside the MCC.

Mr. Mata has not been idle while in custody. Prior to the pandemic, while he was in Jerome Combs Detention Center in Kankakee County, he took educational courses, as noted in

the letter submitted by Cpl. LeSage, the Classification Supervisor at Jerome Combs Detention Center. Cpl. Lage explained in his letter that Mr. Mata has be involved in multiple programs including the "Thinking of Change Program," from which he graduated. Mr. Mata was also in "Advance Group Therapy," which is limited to those who graduated from the "Thinking of Change Program." Furthermore, he participated in the Riverside Healthcare substance abuse program, earning his certificate of completion on October 19, 2017. Mr. Mata also received numerous certificates for his participation in World Bible School. On page 26, paragraph 113, the PSIR states that Mr. Mata participated in a parenting class, and since January 2020, has been participating in a commercial driver's license course. Despite his membership in the Latin Kings, Mr. Mata has many positive factors in his life.

### 2. *The Need for the Sentence Imposed*

Even before the Guidelines were advisory, sentencing courts were to treat all defendants as individuals. In *Koon v. United States*, the Supreme Court explained that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing Judge to consider every convicted person as an individual and every case as a unique study in the human feelings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." 518 U.S. 81, 113 (1996). The command of the parsimony provision of § 3553(a)(2) gives this Court great latitude to impose a sentence that fits both the crime, and Mr. Mata the person. It further "requires the district court to impose the least severe sanction necessary to achieve the four purposes of sentencing." *United States v. Jackson*, 537 F. Supp. 2d 990, 991 (E.D. Wisc. 2008). A sentence of 78 months' imprisonment is sufficient, but not greater than necessary, to satisfy the punishment purposes of 18 U.S.C. § 3553(a)(2) outlined below.

  a. *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*;

Mr. Mata's admirable character traits and commitment to his family distinguish him from the typical defendant who stands before this Court. Mr. Mata recognizes the seriousness of the offense, as it involved violent street gang activity. But Mr. Mata is also a victim of this violence, and has experienced the horror of the Latin Kings turning on him and trying to kill him.

Courts must consider "those factors [that are] unique to an individual defendant … that are not taken into account when … the guideline range … [is calculated]." *United States v. Schmitt*, 495 F.3d 860, 865 (7th Cir. 2007). Mr. Mata's unique traits and qualities are noted in both the PSIR, and in letters submitted to this Honorable Court. He is a hard worker and loving domestic partner and father, who found himself immersed in the gang culture, and he has already paid the price by trying to extract himself from that culture.

Mr. Mata understands that gang life does not promote respect for the law. At this point, Mr. Mata has disavowed his gang life and wants to enter society as a civilian and begin a new life. Mr. Mata has been in custody for more than 73 months, and has learned how crime effects the victims, families of victims, and the accused and their families. Mr. Mata vows to return to only one family, which is his own, and not the Latin Kings.

b. *To afford adequate deterrence to criminal conduct;*

The goal of 18 U.S.C. § 3553 (a)(2)(B) is to deter criminal conduct. With regard to specific deterrence, Mr. Mata's 73 months in prison has already achieved that. Moreover, he learned firsthand, through gunshots that his own supposed gang "family" fired at him, that if he does not continue to stay away from gang life, it will kill him. General deterrence is another issue. The gangs in Chicago have been operating since the 1800s. Many historians believe the origin of the modern street gang was founded in Chicago. The Latin Kings are one of many gangs in Chicago and at least 31 other major cities. Despite sentencing gang members to decades

in prison, and sometimes life in prison, the gang culture still attracts new young members. Even the harshest prison sentences do not deter these individuals, as gangs continue to flourish throughout the Northern District of Illinois.

Gang life is an alternate lifestyle which many people join for different reasons, such as their friends, protection, enjoyment, or respect. No programs have been developed specifically to prevent youths from joining. Mr. Mata wants to be an example and a mentor for those who want to leave the gang life before they die, get maimed or end up in prison.

c.  *To protect the public from further crimes of the defendant*;

The public will be protected because Mr. Mata will not engage in any future gang activity. Mr. Mata has learned, from not only being a victim of Latin King violence, but also through education, that he does not want to engage in any future illegal conduct. He does not want to be caught on the wrong side of the law and has no desire to engage in any more gang activity.

d.  *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment*.

Mr. Mata would certainly benefit from any vocational training programs. Upon his reentry, Mr. Mata will seek employment. He enjoyed working and has a strong work ethic and work history.

## V.      Conclusion

Mr. Mata is ready to begin a new life and requests his proposed sentence.

WHEREFORE, the Defendant, ISRAEL MATA, respectfully requests that this Honorable Court impose a sentence of 78 months' imprisonment, followed by three years of supervised release. Such sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/Joseph R. Lopez*

Joseph R. Lopez
Attorney No. 6186562
Lopez & Lopez, LTD.
53 West Jackson Blvd., Suite 1651
Chicago, IL 60604
(312) 922-2001

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph R. Lopez, an attorney, certify that in accordance with FED. R. CRIM. P. 49,

FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the foregoing

document was served on Friday March 25th, 2022, pursuant to the District Court's system as to

ECF filers.

Respectfully submitted,

*/s/Joseph R. Lopez*

Joseph R. Lopez
Attorney No. 6186562
Lopez & Lopez, LTD.
53 West Jackson Blvd., Suite 1651
Chicago, IL 60604
(312) 922-2001